Richard S. Day, Plaintiff-Appellant, v. Barber-Colman Company, Defendant-Appellee.

Gen. No. 10,894.

Second District.

June 14, 1956.

Released for publication July 3, 1956.

496

Knight, Ingrassia & Bourland, of Rockford, for appellant; Stanley J. Roszkowski, of Rockford, of counsel.

Hyer, Gill & Brown, of Rockford, for appellee; Robert C. Gill, of Rockford, of counsel.

JUSTICE CROW delivered the opinion of the court.

The plaintiff, Richard S. Day, obtained a verdict for $9,500 by a jury against the defendant, Barber-Colman Co., for injuries received while he was assembling and installing an overhead vertical door manufactured and sold by the defendant. The trial court granted a motion of the defendant for judgment notwithstanding the verdict and entered a judgment for the defendant. The plaintiff appeals from that judgment.

The complaint charges that on February 12, 1951, the plaintiff was employed by one A. Dobnick of Rockford; that Dobnick was requested by the defendant to install the overhead, vertical door which it manufactured and had sold to the Yates American Machine

Company in Beloit, Wisconsin, to be used in their factory; and that while the plaintiff was assisting in such installation and while in the exercise of due care and caution, and as a proximate result of defendant's negligent conduct, the door fell upon him, by reason of which he was severely injured and suffered great damage. The complaint, in substance, charged the defendant with negligently failing to have a proper stopping device on the door which would have prevented it from falling upon the plaintiff during assembly and installation, and in failing to have any stopping mechanism that would prevent the turnbuckles from breaking if the door became overbalanced and began to fall. The defendant's answer denied the allegations as to the plaintiff's due care, the defendant's duty, negligence, and proximate cause. Other features of the pleadings need not now be noted. The plaintiff's theory is that the defendant was negligent in the design, manufacture, and testing of the door.

The defendant's theory is that there was no evidence fairly tending to prove negligence, proximate cause, or absence of contributory negligence, and there was affirmative proof of contributory negligence, as a matter of law.

Many of the facts are not in dispute. The assembling and installation of the door, weighing some 500 pounds, took place at the plant of the Yates American Machine Company in Beloit. The plaintiff was on and prior to February 12, 1951 employed by Dobnick, was a licensed and experienced mechanic, on that date was assisting Dobnick in the installation, and was working below the door, engaged in picking up some tools, block and tackle, etc. The door, manufactured and sold by the defendant, was suspended in its tracks in the "up" position and remained "up" possibly for as long as 15 minutes before it fell. The total weight was approximately 1,000 pounds, comprising a 500 pound door and

500 pounds of weights holding it up. It was designed to go straight up and down by rollers thereon set in tracks on either side similar to a residential garage door, assisted by counterbalancing weights suspended by chains attached by turnbuckles designed to adjust the length of the chains. The door was motionless immediately before it fell. Dobnick was at the time securing some weights in place. The plaintiff knew, of course, that if at a particular point in the assembling process the installer had overbalanced the door with weights so that it was then weight heavy and door light, the door necessarily would rise, unless some mechanical steps had been taken to prevent its rising, and, as the plaintiff says, it would have been common sense to anchor it. The door was open, or in an up position, just before the incident happened, and the installers were preparing to attach the last weight. For some reason the door suddenly moved from its stationary position, evidently rose too high, the turnbuckles broke from the weight of the door causing them to rise over the sprocket wheels, which accommodated the chains holding the weights, and the door then fell, striking the plaintiff.

The plaintiff had never received any personal instructions as to this particular installation, but there were printed instructions from the defendant (though they were not in evidence, and there was no evidence as to what they were). He had been trained on the job by the defendant and Dobnick, and had previously installed many other similar doors, but none of this particular type. At the time, he was working, he said, in accordance with the written instructions, and he had had no prior accident of this type.

The various sections of the door, to be set in the tracks and hinged together, and the other parts of the door assembly, were manufactured by the defendant and sent by it in disassembled parts to the place of in-

stallation, to be assembled and installed by the installer; they were assembled and installed by the use of a block and tackle; it was necessary to raise the door manually during assembly and installation by block and tackle, to insert the several sections and attach the counterbalancing weights; and it was supported thereby during that time. After the installation was completed, an electric operating device would control, move, and stop the door. The plaintiff knew he could effectively arrest the movement of the door up or down during assembly and installation by means of what are called "C" clamps and a block (and evidently the block and tackle also aided in controlling the door during that process). He had, in fact, used a "C" clamp, a simple mechanical device, during some part of this particular installation, which clamp was put in the track and roller mechanism in order to hold a wedge in place and thereby keep the door from moving while being installed. There were no stops, however, included in the box sent by the defendant for the installer to arrest the movement of the door during assembly and installation. The turnbuckles were not designed or intended to bear the kind of bending stress they received here; they are not stopping devices, but are designed to adjust the length of the chain. The plaintiff knew the electrical operating device had not yet been installed.

The disassembled parts of the door when assembled and installed formed a safe door, with an electrical control device to control its movements. There is no proof the door when installed was not a safe, properly functioning door. Dobnick was an independent contractor engaged in the business of assembling and installing such doors, was in complete charge of that process, and the defendant had and exercised no control over that.

The plaintiff called one Harold Kelton, an engineer, as a witness, who was formerly employed by the de-

fendant in charge of engineering of the door division, and he was familiar with the door here involved. He said there was no convenient or customary way to install the electrical control device for the door until after the door was installed. He said when the door got around the turnbuckles and the turnbuckles got around the sprocket wheel there was a bending stress and the turnbuckles bent and broke. In his opinion, if a block or "C" clamp had been securely fastened at the time, the door would not have risen. He testified that the door at that time was not equipped with a staggered lift chain. The purpose of a staggered lift chain would have been to stagger the turnbuckles on either side one higher than the other, so that if the door during installation ever went high enough and the turnbuckles went over the sprockets, one turnbuckle would break before the other broke, thus supporting the door at least from one side only, causing it to bind in the tracks rather than fall straight down. He also said he had something else besides a possible staggered lift chain in mind that would have prevented the door going up and over the turnbuckles (though what he had in mind he did not say). He testified further, however, that he had had nothing in mind for a staggering arrangement of the chain (or anything else of a similar nature apparently) at the time of or prior to the incident here concerned, there were no plans at that time for any stop on the door during installation, and evidently a so-called staggered lift chain was not at that time in the industry an accepted or customary part of the art of manufacture of the door. There is no evidence that at that time any different general design for a door of this type than the one here involved was in common or accepted use in the industry, or that this design had been found to be unsafe. His testimony as to some possible change in design related to a matter apparently occurring to him some years after this in-

cident. His testimony in that respect was given some four years after this door was installed.

It appears that a "C" clamp is one of the standard, ordinary installation tools or means used by installers in the process of installation. It is used to keep the door from going up or down during assembly and installation, if it is securely fastened. The "C" clamps had been brought to the job by the installers in this case, had at times been used here, but apparently were not in use at the particular time this door fell.

The door was not a new type of door. It was made according to a standardized design or drawing, modified only as to size to fit a particular opening for which it was designed. There is no proof of any defective materials used by the defendant in the manufacture of the disassembled parts of the door, or of any failure to use due care as to any testing or inspecting thereof, or of what testing and inspecting procedures were at the time current in the industry, or considered adequate.

 We are confronted at the outset with the question as to whether there is any competent evidence, standing alone, together with any reasonable inferences to be drawn therefrom, taken with its intendments most favorable to the plaintiff, to support the charge that the defendant was negligent in the design or manufacture of the door, or to prove the other material elements of the plaintiff's case. If not, the defendant's motion for judgment notwithstanding the verdict was properly allowed: Lindroth v. Walgreen Co. (1950) 407 Ill. 121. Upon such a motion we can consider only the competent evidence: Hunter v. Troup (1924) 315 Ill. 293. Evidence that has no probative force, whether objected to or not, cannot be considered: Knudson v. Knudson (1943) 382 Ill. 492. Evidence sufficient to defeat such a motion must be evidence upon which the jury could, without acting unreasonably in the eyes of the law, decide in favor of the plaintiff: American Nat.

Bank v. Woolard (1930) 342 Ill. 148; Provenzano v. Illinois Cent. R. Co. (1934) 357 Ill. 192.

■■ A manufacturer, under Illinois law, is not liable in damages to persons with whom it has no contractual relations and is not in privity for personal injuries or property damages sustained by such persons because of the alleged negligent manufacture of a product, except where the product is inherently, normally, and imminently dangerous, and except where, though not inherently, normally, or imminently dangerous, its nature is such that it may become so if negligently manufactured: Rotche v. Buick Motor Co. (1934) 358 Ill. 507. Other cases to the same effect are: Field v. French (1898) 80 Ill. App. 78; Shepard v. Kensington Steel Co. (1931) 262 Ill. App. 117; Alschuler v. Rockford Bolt & Steel Co. (1943) 318 Ill. App. 564; Beadles v. Servel Inc. (1951) 344 Ill. App. 133. Another exception has also been said to be where the manufacturer's negligence consists of a fraudulent or deceitful statement or misrepresentation: Miller v. Sears, Roebuck & Co. of Illinois (1928) 250 Ill. App. 340. And in those excepted cases where, regardless of the presence or absence of contractual relations or privity, there may possibly be a liability, the mere fact that an accident resulting in an injury to person or property occurs does not authorize a presumption or inference that the manufacturer of the product was negligent; the burden is on the plaintiff to prove by competent evidence, direct or circumstantial, that the manufacturer was negligent in the manufacture of the product: Rotche v. Buick Motor Co., supra; Lindroth v. Walgreen Co., supra.

The parties appear to have tried this case on the basis that Illinois law applies, or that Illinois law and Wisconsin law in this respect are the same, as apparently is the case: Reed & Barton Corp. v. Maas, 73 F.2d 359 (CCA 1st, 1934), and we shall be governed accordingly.

503

■ Neither of the parties have referred us to a case of similar injuries under similar circumstances and we've found none in Illinois. Almost any otherwise innocent article may, under some extraordinary circumstances, injure a person, but that does not render the article itself inherently and imminently dangerous; there is scarcely an object in art or nature from which an injury may not occur under some circumstances, but that is not the test as to whether it is inherently and imminently dangerous: Miller v. Sears, Roebuck & Co. of Illinois, supra. The test is,—how dangerous is this product with the particular defect, if any, it is alleged and proven to have in a particular case,—is the product, as defectively made (if so alleged and proven in a particular case) inherently dangerous when put to its intended use: Beadles v. Servel Inc., supra.

Alschuler v. Rockford Bolt & Steel Co., supra, is probably as close to the present case as any we've been referred to or found. There the defendant Rockford Bolt & Steel Co. was alleged to have manufactured the disassembled parts of certain scaffold equipment,—metal bases, upright metal supports, metal hooks or brackets, etc.,—for one Sloan who was the inventor of this type of scaffold; Sloan allegedly sold the equipment to the Briggs Company; that company sold it to Alschuler; Alschuler was a plastering and lathing contractor for certain buildings; he sublet the lathing work to Nadon, a subcontractor, Alschuler furnishing the scaffold, and Whitman, an employee of Nadon, fell and was injured while working on the scaffold when some of the hooks broke, allegedly because of negligent construction; Alschuler, the contractor, and Nadon, the subcontractor, paid workmen's compensation on account of the injury and, on a subrogation basis, sued the defendant manufacturer on account of Whitman's injuries. A motion to strike an amended complaint was sustained, the plaintiffs stood thereon, a judgment was entered for the defendant, and on appeal this was

affirmed. The Court commented on Colbert v. Holland Furnace Co. (1928) 333 Ill. 78, Lill v. Murphy Door Bed Co. of Chicago (1937) 290 Ill. App. 328, and Davidson v. Montgomery Ward & Co. (1912) 171 Ill. App. 355 (which are among those cases cited by the plaintiff in the case at bar), thought them not to be in point, and, considering Shepard v. Kensington Steel Co., supra, to be more nearly in point, said, pp. 570, 573:

"The main point relied upon by the appellee, to sustain the ruling of the court on their motion, is that the manufacturer of an article is not liable to a third party who had no contractual relation directly, or indirectly with the manufacturer, unless the article was inherently dangerous to life or property. The appellants admit this to be the usual rule, but they contend there are exceptions to this rule which apply to the present case.

. . . . .

"We think the law, as announced in that case, (referring to Shepard v. Kensington Steel Co.) is very applicable to the facts in the present case. We find that the manufacturer, the Rockford Bolt & Steel Company, who manufactured the alleged defective parts of the scaffold, and the employee of the plaintiff who was injured by using the scaffold, had no privity of contract between them by which a suit for injuries could be maintained. The judgment of the trial court is hereby affirmed."

█ The defendant manufacturer of this door or the disassembled parts of this door and the plaintiff employee of A. Dobnick, the installer, had no contractual relations between them and were not in privity with each other. The defendant manufacturer had contractual relations with and was in privity with the Yates American Machine Co. for whom it manufactured and to whom it had sold the door, and with A. Dobnick with and by whom, as an independent contrac-

505

tor, it contracted the door should be assembled and installed. But it had no such relations with this plaintiff. There is no proof here that the product involved, the door, or its disassembled parts, was inherently, normally, or imminently dangerous, or, from anything in evidence here, that its nature was such that it might become so if, in any respect material here, negligently manufactured, and there is no allegation or proof that there was any fraudulent or deceitful statement or misrepresentation by the defendant. Accordingly, there was no duty in the premises by the defendant towards this plaintiff, and, necessarily, there could be, and was, no breach of duty, or negligence: Walters v. Christy (1955) 5 Ill.App.2d 68.

But, assuming that there was a duty by the defendant manufacturer towards this plaintiff, there is no presumption or inference that the defendant was negligent; the burden is on the plaintiff to prove, by competent evidence, that the defendant was negligent, and there is no evidence the defendant was negligent in the design or manufacture or testing of the door. It was not a new type, but made according to a standardized design or drawing. No defective materials were used in the manufacture of the disassembled parts thereof, and there was no failure by the defendant to follow any reasonable testing or inspecting procedures common in the industry, so far as the evidence here indicates. The door was manufactured in disassembled parts and so sent to the place of installation. There were printed instructions. When fully assembled and installed ready to be used as a door, with its electrical control device, the door apparently was a safe, properly functioning product,—there is no proof to the contrary. The electrical control device could not reasonably be installed until after the door was completely installed. No different general design for a door of this type than the design here involved was in common use in the industry at that time, and this design had not been found to

be unsafe, so far as the record here indicates. There is uncontroverted evidence adduced by the plaintiff that probably some 150 doors of like design had been previously manufactued by the defendant, and had been installed, with no incidents of the type here involved having occurred. That is, of course, not conclusive as to the defendant's alleged negligence, but it is a fact of significance bearing on its exercise of due care. That is the only history of the design, manufacture, and use of the product prior to this incident. The assembling and installation were by an independent contractor, and the defendant had and exercised no control over that. Both that contractor and his employee, the plaintiff, were evidently qualified tradesmen and mechanics and experienced in this type of work. We do not believe that, under the circumstances, the evidence tends to show that the defendant was negligent in the design or manufacture or testing thereof or in not altering its design prior to this incident. The design having evidently been found safe in the industry by experience and having been many times used safely by installers, the state of the art at the time and the prior history of the use of the product would not have indicated or required any material change in the design, or manufacture. That the defendant itself provided no so-called stops,—meaning, presumably, "C" clamps and blocks or block and tackle,—to control or arrest the movements of the incompleted door during assembly and installation thereof by the independent contractor installer, cannot be considered negligence, or, if negligence, cannot be considered the proximate cause of the injuries here, when there is nothing to indicate it was usual or customary for the defendant to do so as a part of its duties, but, on the contrary, that it was evidently usual or customary for the installer to do so, and where the installer did, in fact, do so here, and where even if the defendant had so provided such stops they would, nevertheless, have had to be used and inserted in the track

and roller mechanism or otherwise attached by the independent contractor installer who, for some unexplained reason, though they were readily available to him, did not, in fact, do so here at the particular time concerned, and over the details of whose work the defendant had and exercised no control.

There is no evidence to the effect that the door, or its disassembled parts, was, in fact, changed in design or manufacture or repaired after this incident, or that there was, in fact, at the time concerned a safer or better available design commonly in use in the industry, such as a staggered lift chain, but the testimony of the plaintiff's witness Harold Kelton was, in part, directed generally along those lines, and to that extent should be commented on. It is, of course, well settled that the question of the defendant's alleged negligence must be determined only by what occurred before and at the time of the incident, under then existing circumstances, and any evidence, if there were any, of alleged changes or repairs made afterwards was not admissible: Howe v. Medaris (1899) 183 Ill. 288; Grubb v. Illinois Terminal Co. (1937) 366 Ill. 330; Schuman v. Bader & Co. (1922) 227 Ill. App. 28. And there was no obligation resting on the defendant manufacturer to adopt every possible new device which might possibly have been conceived or invented, if there were any; it is not of itself negligence to use a particular design or method in the manufacture or handling of a product or doing a job which is reasonably safe and in customary use in the industry, although other possible designs, whether in use in the industry or not, might be conceived which would be safer, and evidence as to what is thought by some to be a safer design or method or product is not admissible: American Malting Co. v. Lelivelt (1902) 101 Ill. App. 320; Bohn v. Standard Laundry Co. (1909) 148 Ill. App. 494; Reddick v. General Chemical Co. (1905) 124 Ill.

App. 31; Kennedy v. Chicago & Carterville Coal Co. (1913) 180 Ill. App. 42. The fact that an accident was, conceivably, avoidable, and might, conceivably, have been prevented does not warrant a jury in finding that there was fault or negligence by the defendant in not anticipating and providing against it: Illinois Steel Co. v. Zolnowski (1905) 118 Ill. App. 209, affirmed (1908) 233 Ill. 299. To that extent the testimony of the witness Kelton was incompetent and inadmissible and can be given no consideration.

The principal Illinois cases the plaintiff cites on the merits are: Colbert v. Holland Furnace Co. (1928) 333 Ill. 78; Wintersteen v. National Cooperage & Woodenware Co. (1935) 361 Ill. 95; Davidson v. Montgomery Ward & Co. (1912) 171 Ill. App. 355; Lill v. Murphy Door Bed Co. of Chicago (1937) 290 Ill. App. 328; Carson v. Weston Hotel Corp. (1951) 342 Ill. App. 602; and Brown v. Sterling Abrasives Division of Cleveland Quarries Co. (1955) 5 Ill.App.2d 1. Wintersteen v. National Cooperage & Woodenware Co. is not a case involving any alleged defect in the manufacture or inspecting of some product, but involved only the negligence of a manufacturer in the manner of loading some of its barrels in a railroad car by reason of which the plaintiff, while unloading them, was injured when one fell upon him, and it has no bearing at all on the present case. The other cases are well within the principles of Rotche v. Buick Motor Co., supra, and the cases following it to which we have referred, and relate to products which are not inherently, normally, or imminently dangerous, but the nature of which is such that they may become so if negligently manufactured, or relate to products as to which there has been some false statement or misrepresentation by the manufacturer, and merely involve different applications of those principles to different factual situations. They are entirely consistent

509

in principle with our views here, but they are inapplicable to the present facts. They all involved some malfunctioning, due to alleged negligence of the manufacturer, of some manufactured item when and after it had been completely installed, presumably ready for its ultimate use, and was being put to the ultimate use for which it was manufactured and intended. None of them involved a situation such as this case of the manufacture of a door in disassembled uninstalled parts and an injury to the assembler or installer thereof while in the process of assembling and installing it and before it is completely installed as a finished door and before it is put to the ultimate use for which, as a finished door, it was manufactured and intended. There also is no proof here of any negligent defective condition or construction or inspection or failure of inspection of this door or its disassembled parts, which rendered it inherently, normally, or imminently dangerous, or any false misrepresentation as to the same.

The principal cases the plaintiff cites from other jurisdictions on the merits are: MacPherson v. Buick Motor Co. (1916) 217 N. Y. 382; Anderson v. Linton, 178 F.2d 304 (CA 7th, 1949); Laclede Steel Co. v. Silas Mason Co., 67 F. Supp. 751 (D. C. W. D. La. 1946); and Reed & Barton Corp. v. Maas, 73 F.2d 359 (CCA 1st, 1934). Those cases also are well within the principles of Rotche v. Buick Motor Co., supra, relating to products which are either inherently, normally, and imminently dangerous, or may become so if negligently manufactured, and merely involved again varying applications of the principles to varying factual situations. They again are entirely consistent in principle with our views, but are inapplicable to the present facts. Again, none of them involved the manufacture of a product in disassembled uninstalled parts and an injury to the installer while in the process of installation and before the product is complete as a finished

510

product and is put to its ultimate use for which, as a finished product, it was manufactured and intended. This door, or its disassembled parts, was not inherently dangerous, and this is not a case where due to negligence of the manufacturer the door, or its disassembled parts, has become an article fraught with danger and where it is probable that injury would result from its proper use in the manner in which it was intended for use.

 Further, we believe the plaintiff was guilty of contributory negligence as a matter of law. The question of due care on the part of the plaintiff is ordinarily one of fact for the jury, but when the facts bearing thereon rest solely upon his own testimony, and the attendant circumstances that are not in dispute, the Court then has the duty of determining, as a matter of law, whether he, in fact, used ordinary caution for his own safety: Pollard v. Broadway Cent. Hotel Corp. (1933) 269 Ill. App. 77. Where a plaintiff is thoroughly familiar with a possible hazard involved in the performance of his job and with the means to avoid such, the fact that at a particular time he may have been momentarily unmindful thereof, forgetful thereof, or have overlooked the same does not absolve him from the duty of observing due care for his own safety: Munsen v. Illinois Northern Utilities Co. (1930) 258 Ill. App. 438. If a plaintiff has available to him two different methods or ways of doing a job, performing a task, or proceeding,—one previously tried and known to be safe,—the other either unknown and unexplored or known to involve certain possible hazards, —and he chooses the method or way which is unknown and unexplored or known to involve certain possible hazards, and is injured in the process, he is contributorily negligent as a matter of law: Geraghty v. Burr Oak Lanes Inc. (1954) 2 Ill.App.2d 48.

511

The plaintiff here was a licensed and experienced mechanic. He was not a novice, or a mere passerby. He had been trained on the job. He had previously installed or helped install many other similar doors, though not one of this particular type. He knew the electrical operating device had not yet been installed and that any control over the movements of the incompleted door had to be done manually or mechanically. During assembly and installation it had to be manually raised and lowered several times by block and tackle to insert the several sections and attach the several counterbalancing weights. He was aware that if at some point in the process the installer temporarily overbalanced the door with weights so it was weight heavy and door light it necessarily would rise unless some steps had been taken to prevent such, and that just before this incident occurred Dobnick was preparing to put on the last weight, and that it would have been common sense to have anchored the incompleted door. He knew it was open, up, just before the incident occurred, and he was working directly under it. He was fully aware, just as his witness Harold Kelton testified, that the movements of the door up or down during assembly and installation could be effectively arrested and controlled by a "C" clamp and a block (and, for that matter, also by the block and tackle),—standard, ordinary, simple installation tools and equipment, which devices had, in fact, been used on this very job during parts of the installation, but which devices, for some unexplained reason, were not in use at the particular time this incident occurred. If at the time this happened the plaintiff was momentarily unmindful of, or forgetful of, or overlooked the possible hazard of the incompleted door, temporarily uncontrolled by a "C" clamp and block (or block and tackle), and temporarily weight heavy and door light because of the attachment of the counterbalancing weight, rising and

512

then falling on him as he worked directly under it, that does not absolve him from the duty to observe due care for his own safety. Having available to him a method or way of doing the job, previously tried and known to be safe, by controlling the movements of the incompleted door during installation by a simple "C" clamp and block (or block and tackle), and having, nevertheless, perhaps from sheer momentary forgetfulness or oversight, chosen at the moment not to follow that method or way, but another way known to involve those possible hazards, he was, we believe, contributorily negligent as a matter of law.

The competent evidence here was not such that the jury could, without acting unreasonably, have decided in favor of the plaintiff, and, hence, the motion for judgment notwithstanding the verdict was correctly allowed and the judgment will be affirmed.

Affirmed.

DOVE, P. J. and EOVALDI, J., concur.